GARY Y. LEUNG, (Cal Bar No. 302928)
Email: leungg@sec.gov
MANUEL VAZQUEZ (Cal. Bar No. 295576)
Email: vazquezm@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
Lorraine Echavarria, Associate Regional Director
John W. Berry, Regional Trial Counsel
444 S. Flower Street, Ste. 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (323) 965-3908

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>         Plaintiff,<br><br>    vs.<br><br>COMMODORE FINANCIAL CORPORATION, CHRISTOPHER SCHLEGEL, M&G CAP SERVICES, and ANDRES CALVO,<br><br>         Defendants. | Case No.<br><br>**COMPLAINT** |

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## JURISDICTION AND VENUE

1.  The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e), and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa(a).

2.  Venue is proper in this district under Section 22(a) of the Securities Act,

15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a) because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district.

## SUMMARY

3. This case involves a $7.5 million securities offering fraud orchestrated by Defendants Commodore Financial Corporation ("CFC") and Christopher Schlegel, CFC's chief executive officer. Schlegel and CFC offered and sold to investors purported working interests in oil and gas wells located in Louisiana and Mississippi. A "working interest" is a form of investment in oil and gas drilling operations in which the holder pays a percentage of the costs associated with exploration, drilling, and production, and receives in exchange a percentage share of any net profits generated by the project.

4. Schlegel and CFC told investors that CFC was an experienced oil and gas company with a proven track record of profitability, and that it was offering, for investment, fractional shares of the working interests CFC had acquired in soon-to-be profitable oil and gas properties. They told investors that the vast majority of investor money – 80% to 90% – would be used to fund these operations. And when soliciting investors for their second fraudulent securities offering, they told investors that investment returns from CFC's first oil and gas offering were imminent. These representations were uniformly false.

5. Schlegel and CFC had no real experience in the oil and gas industry. They had nothing to do with the track record of lucrative past projects described in CFC's offering materials; Schlegel and CFC simply passed them off – falsely – as their own work. Last, Schlegel and CFC's efforts to entice new investment in a second oil and gas offering by claiming that CFC was "almost finished preparing checks" for its earlier investors were false – at that time, CFC's oil and gas interests had not generated a single dollar of revenue.

6. Schlegel then misappropriated nearly half of the money raised from

COMPLAINT 2

investors. Instead of funding oil and gas operations, Schlegel siphoned approximately $3.5 million of the $7.5 million raised for the exorbitant commissions he paid to the unregistered salespeople marketing CFC's offerings to the investing public, and for his own personal use (including, among other things, private jet charters and casino expenses). Because CFC and Schlegel used only half of the raised investor funds for investment in oil and gas operations, CFC, in very short order, predictably fell behind in the operational costs that it owed to the company operating the oil and gas projects CFC held working interests in. With those obligations in arrears, the operator ceased paying CFC revenues from oil and gas operations at the end of August 2014, and CFC's payments to its own investors ended thereafter. To date, an approximate total of only $249,000 of the $7.5 million invested has been returned to CFC investors (many of whom received no returns), and all remaining funds are presently unaccounted for.

7. Through his company, M&G Cap Services ("M&G"), Defendant Andres Calvo ran boiler rooms in California and Arizona that solicited the investors defrauded by CFC, primarily through "cold calls" to "lead lists" of potential investors. Neither Calvo, nor M&G, however, were registered with the SEC as a broker-dealer, or otherwise associated with a registered broker-dealer. Moreover, Calvo and M&G misrepresented their commission rates, including lying to one of CFC's largest investors when they told him – in the course of soliciting his substantial investment – that their sales operation would receive as a commission no more than 10% of his investment.

8. As a result of the conduct alleged herein, Defendants Schlegel, CFC, Calvo and M&G have violated the antifraud provisions of the Securities Act and the Exchange Act, Defendants Calvo and M&G have violated the broker-dealer registration provisions of Section 15 of the Exchange Act, and all Defendants have violated the securities registration provisions of Section 5 of the Securities Act.

9. With this Complaint, the SEC seeks permanent injunctive relief against

Defendants from violations of the antifraud and registration provisions of the federal securities laws, disgorgement of ill-gotten gains along with prejudgment interest, and civil penalties.

## DEFENDANTS

10. Christopher Schlegel, 35, resides in Rancho Santa Margarita, California. Schlegel is the president and chief executive officer of CFC. He has never been registered with the SEC in any capacity. He has never held any securities licenses.

11. CFC is a California corporation organized in August 1984. CFC is based in Rancho Santa Margarita, California. At all relevant times, CFC was controlled by Schlegel, its president and chief executive officer. Schlegel is CFC's only employee. CFC and its securities are not registered with the SEC in any capacity.

12. Andres Calvo, 32, resides in Scottsdale, Arizona. Calvo is the manager of M&G and the sole signatory on its bank account. He is not registered with the SEC in any capacity and holds no securities licenses.

13. M&G is an Arizona limited liability corporation formed in June 2012 and based in Scottsdale, Arizona. At all relevant times, M&G was controlled by Calvo. M&G is not registered with the SEC in any capacity.

## FACTUAL ALLEGATIONS

**A.   CFC's Unregistered Offering**

**1.   Background**

14. From January 2013 through June 2014, CFC raised about $7,535,000 from at least 84 investors through an unregistered offer and sale of purported working interests in oil and gas wells located in Louisiana and Mississippi. These 84 investors resided in multiple states, including California.

15. Defendants offered and sold securities in the form of investment contracts which purportedly assigned CFC's oil and gas working interests to investors. They sold these securities to investors and potential investors in three

phases.

16. A "working interest" is a form of investment in oil and gas drilling operations. The holder of a working interest is responsible for paying a percentage of the costs associated with exploration, drilling, and production. The holder of a working interest is correspondingly entitled to a percentage share of any net profits generated by the oil and gas development.

17. During "Phase 1," which took place from January to September 2013, Defendants offered a 1% oil and gas working interest in about five wells purportedly located in a field called, "Stark Salt Dome." During this phase, Defendants raised money from about 56 investors.

18. During "Phase 2," which spanned from September 2013 to June 2014, Defendants offered 1% oil and gas working interests in about five wells located, according to Defendants, in fields called "Milestone Forks" and "Horseshoe Lake." During this phase, Defendants raised money from about 48 investors, some of whom had previously invested in Phase 1.

19. "Phase 3" lasted only a single month, in June 2014. In that time, Defendants raised money from a family of two investors. In a private placement memorandum provided to these investors by CFC and Schlegel, CFC offered oil and gas working interests, in an amount to be determined later, for certain unspecified oil and gas wells located in various Louisiana and Mississippi counties. CFC and Schlegel abruptly ended their Phase 3 sales efforts in June 2014, when government authorities began contacting CFC's investors.

**2.     Defendants' solicitation of investors**

20. Defendants, directly and indirectly, solicited investors through various salespeople in boiler rooms run by Calvo, CFC's internet website, written materials, electronic mail, word-of-mouth, and in-person communications. Defendants offered and sold CFC's oil and gas investment opportunities to investors across the United States.

21.     Schlegel drafted, edited, and controlled all of the content published on CFC's website.

22.     CFC's website described its oil and gas investment opportunities as follows:

> Commodore Financial Corporation offers unique oil and natural gas investment opportunities through direct participation programs. Our investment programs enable investors to participate in monthly cash flow, as well as the unique tax benefits associated with oil and natural gas investing. These benefits where [sic] once only available to the industry professionals but are now open to individual investors looking for an industry to grow their money with.

23.     CFC and Schlegel further provided, directly and indirectly, investors and potential investors with written materials detailing the oil and gas projects for which their investment was sought, describing their projected annual returns on investment, and listing past oil and gas projects in which CFC had successfully achieved substantial investment gains.

24.     Schlegel was solely responsible for reviewing these materials and making a final decision on what should be provided to investors and potential investors.

25.     CFC and Schlegel also solicited investors through two boiler room operations run by Calvo, one in Irvine, California, and the other in Scottsdale, Arizona.

26.     In these boiler rooms, Calvo supervised a group of salespeople who marketed, on Schlegel and CFC's behalf, purported assignments of CFC oil and gas working interests to investors and potential investors.

27.     At Schlegel's direction and under Calvo's supervision, these salespeople "cold-called" potential investors using contact information obtained from lead lists.

They then used written sales scripts drafted and provided by Schlegel to pitch investors on CFC investment opportunities, and also gave investors and potential investors copies of CFC's offering materials. Calvo's salespeople further participated in taking investors' orders once they decided to invest with CFC.

28. Schlegel paid Calvo, through Calvo's company M&G, transaction-based compensation in the form of sales commissions. Calvo and M&G received approximately $1.7 million in connection with the $7.5 million raised from CFC investors (about 23% of investor funds).

29. Last, both Schlegel and Calvo directly spoke with investors and potential investors, over the phone and in person, to solicit their investment.

### 3.  Terms of the CFC offering

30. In order to invest in the CFC offering, CFC and Schlegel required investors to execute a standard participation agreement.

31. For Phase 1, the CFC participation agreement ("Phase 1 Participation Agreement") represented that CFC "owns [a] 44% Working Interest in Starks Salt Dome Area Joint Venture and is offering Working Interest participation in the Joint Venture[.]"

32. Under the terms of the Phase 1 Participation Agreement, investors paid a flat amount – $57,150.00 – in exchange for a 1% working interest in about five wells to be developed by the "Starks Salt Dome Area Joint Venture."

33. Although investors would not be formally assigned their purported working interest upon payment, the agreement stated that investors would eventually receive their 1% working interest within "60 days after the completion of the last well drilled or the receipt of assignment from the leaseholder, whichever is later."

34. Under the terms of the Phase 1 Participation Agreement, investors would receive 75% of the net revenue generated by their 1% working interest, should any profits be realized from the Stark Salt Dome Joint Venture.

35. The Phase 1 Participation Agreement further stated that CFC reserved

1  for itself "full authority to manage [the] Stark Salt Dome Joint Venture."

2      36.    The standard CFC participation agreement for Phase 2 ("Phase 2
3  Participation Agreement") was substantially similar to the Phase 1 Participation
4  Agreement.

5      37.    The Phase 2 Participation Agreement represented that CFC "owns [a]
6  20% Working Interest in Horseshoe Frio Phase II Joint Venture and is offering
7  Working Interest participation in the Joint Venture, which is located in Louisiana."

8      38.    Under the terms of the Phase 2 Participation Agreement, investors paid a
9  higher flat amount – $100,000 – in exchange for a 1% working interest in about five
10 wells to be developed by the "Horseshoe Frio Phase II Joint Venture."

11     39.    Once again, investment did not trigger an immediate assignment of the
12 supposed 1% working interest; instead, the Phase 2 Participation Agreement provided
13 that investors would eventually receive their 1% working interest within "60 days
14 after the completion of the last well drilled or the receipt of assignment from the
15 leaseholder, whichever is later."

16     40.    Under the terms of the Phase 2 Participation Agreement, investors would
17 receive 75% of the net revenue generated by their 1% working interest, should any
18 profits be realized from the Horseshoe Frio Phase II Joint Venture.

19     41.    The Phase 2 Participation Agreement similarly stated that CFC reserved
20 for itself "full authority to manage [the] Horseshoe Frio Phase II Joint Venture."

21     42.    The only investors in Phase 3 executed the same form Phase 2
22 Participation Agreement as the Phase 2 investors.

**B.  Schlegel's and CFC's Fraudulent Scheme to Misappropriate and Misuse Investor Proceeds**

25     43.    Schlegel and CFC told prospective and existing investors that 80% to
26 90% of their investment would be used for oil and gas operations.

27     44.    The CFC participation agreements confirmed this representation by
28 providing that investors were purchasing working interests in order to "participate in

COMPLAINT                                   8

the reentry, reworking and or [*sic*] drilling and completion attempt" of various oil and gas wells identified for development by CFC.

45. In private placement memoranda provided to certain investors – who received these materials only subsequent to their investment – CFC projected that 80% (for Phase 1) and 88% (for Phase 2) of investor proceeds would be spent on oil and gas acquisition, operations, and hedging activities.

46. Because of these representations, CFC's investors believed that their money would be used in a manner consistent with the basic nature of their investment. They believed that CFC would apply investor funds towards operating the oil and gas properties that CFC had marketed to them, with the goal of ultimately extracting oil and gas from those properties, which would in turn generate investment gains.

47. Schlegel and CFC, however, defrauded their investors by misappropriating and misusing nearly half of all investor funds.

48. Schlegel had signatory authority over all bank accounts held by CFC and its affiliates. With that authority, Schlegel misappropriated and misused approximately 47% of all investor funds.

49. Of the more than $7.5 million raised from investors, Schlegel diverted $1.813 million to himself through cash withdrawals and transfers to his personal accounts. This amount included amounts spent in Las Vegas casinos and private jet charters.

50. Of the more than $7.5 million raised from investors, Schlegel paid $1.725 million in commissions to Calvo and M&G.

51. Only about 48% – or approximately $3.586 million – of the money given to CFC by its investors was actually used by CFC to fund oil and gas operations.

52. However, in order to receive its share of net revenue from operations pursuant to CFC's working interests in certain oil and gas properties – working interests that CFC claimed to have then sold 1% shares of to its investors – CFC had

to pay its corresponding share of operational expenses to the third-party operator who was actually performing the necessary development work.

53. In fall 2014, CFC fell behind on the operational expenses it owed to the third-party operator.

54. Thereafter, the operator ceased paying CFC its full share of net revenue from operations.

55. Once the operator stopped paying CFC its full share of net revenue from operations, CFC stopped paying its investors their purported investment returns.

56. In June 2014, after government authorities began contacting CFC's investors, Schlegel closed all of CFC's bank accounts, and took possession of those funds through a series of unusual cashier's check transactions.

57. Except for two investors who were refunded their investment after lodging complaints, no CFC investor has been returned his or her principal investment.

58. As for investment returns, CFC paid 55 of its investors a total of only $249,136.02 in purported returns. 29 of CFC's investors have never received any return on their investment.

59. In all, CFC raised approximately $7.535 million from its investors. With CFC having paid its investors only about $249,136.02 in supposed returns, more than $7 million in investor funds are presently unaccounted for.

60. In furtherance of the fraudulent scheme, Schlegel and CFC also engaged in deceptive acts to create the false appearance that CFC was an experienced, Texas-based operation.

61. To further the illusion of CFC as an oil and gas operator native to the Southwest, Schlegel used "internet protocol" phones to make it falsely appear as though the salespeople marketing CFC investments were calling potential investors from Dallas, Texas, when those salespeople were in fact located in California or Arizona.

62. In addition, Schlegel formed limited liability companies – which served no other purpose than to hold the bank accounts in which investors were deposited – in the state of Texas, again to create the illusion of legitimate, Texas-based oil and gas operations.

### C. Schlegel's and CFC's Material Misrepresentations

63. In connection with the offerings discussed above, Schlegel and CFC also misrepresented, among other things: (1) the extent of Schlegel and CFC's expertise in the oil and gas projects within the southwest United States; (2) Schlegel and CFC's past track record of allegedly profitable oil and gas developments; and (3) the purportedly imminent investment returns soon to be paid to Phase 1 investors during Defendants' solicitation of investors for Phase 2 of the CFC offering.

64. A reasonable investor in the offerings would have considered it important in making their investment to know, among other things, that their funds had been misappropriated for CFC and Schlegel's personal use, that CFC and Schlegel lacked the industry expertise they claimed to have, that CFC's claimed rates of return, operating history, and success in connection with Phase 1 were false, and that in exchange for their substantial monetary investment, CFC would not in fact be assigning them legal title to a working interest in the oil and gas developments identified by CFC as the object of their investment.

65. Schlegel knew these material representations were false when made, or was reckless or negligent in not knowing of their falsity.

#### 1. CFC website

66. On CFC's website, Schlegel and CFC made the following representations to investors and potential investors regarding their investment with CFC:

a) Schlegel and CFC touted their "Over 50 Years [sic] Experience in the Oil & Natural Gas Industry," and described that experience as a record of "undeniable success and respect in the Oil and Gas industry."

1         b)     Schlegel and CFC claimed that "[t]he team at CFC is operating on projects in Texas, Oklahoma, Kansas, and Louisiana" and that CFC was an "Oil and Natural Gas exploration company with headquarters in Dallas Texas."

        c)     Schlegel and CFC listed, under "Current & Past Oil & Natural Gas Projects," development work purportedly carried out by CFC involving hundreds of wells in 16 different oil fields, some dating back to 1979.

        d)     Schlegel and CFC further described CFC's expertise in the oil and natural gas industry as including "state-of-the-art technology, exploration and extraction from both on-shore and off-shore projects and future development."

67.     All of these statements were misleading, false and/or deceptive, and made by Schlegel and CFC in furtherance of a fraudulent scheme.

68.     Neither CFC nor Schlegel had any real experience in the oil and gas industry. Schlegel and CFC did not conduct business operations, in any meaningful way, in the state of Texas.

69.     CFC and Schlegel also had no substantive involvement in any of the "Current & Past Oil & Natural Gas Projects" which CFC's website emphasized as its own track record of success.

**2.  CFC's offering materials**

70.     In CFC's offering materials, Schlegel and CFC made the following representations to investors and potential investors regarding their investment with CFC:

        a)     In the executive summary for Phase 1, CFC and Schlegel claimed a projected annual return of 100% and a projected return on investment in just 13 months.

        b)     That executive summary also listed, under the heading, "Track Record," seven different CFC oil and gas projects, all of which were represented to be enormously profitable. According to the executive summary, more than 60 wells had produced in excess of 55 million barrels of oil, resulting on "ROI To Date" that

ranged from "17.87:1" (for the least profitable project listed) up to "60.88:1" (for the most profitable project listed). In short, CFC's Phase 1 executive summary claimed past oil and gas investment returns exceeding 6000%.

71. All of these statements were misleading, false and/or deceptive, and made by Schlegel and CFC in furtherance of a fraudulent scheme.

72. The track record portrayed in CFC's offering materials was misleading and deceptive because it had no basis in truth. Although some of the identified projects had taken place, CFC and Schlegel had nothing to do with them. They merely passed the work of others off as their own. Other projects listed in CFC's offering materials had never even taken place.

73. With respect to all of the projects identified in CFC's offering materials, the "ROI To Date" figures cited by CFC were also false and misleading. Those figures were simply concocted by Schlegel and CFC and had no factual basis whatsoever.

### 3. Claims of imminent investment returns when marketing Phase 2

74. In February 2014, to solicit investment for Phase 2 of the CFC offering, Schlegel sent a letter to existing investors stating that CFC was "almost finished preparing checks" for Phase 1, and encouraged them to invest in Phase 2. At the same time, Schlegel directed Calvo's boiler room salespeople marketing Phase 2 to tell existing investors seeking updates on their investment that they would be receiving their Phase 1 distribution checks in the near term, with the same goal of spurring their interest in investing with the next phase of the CFC offering.

75. These statements were misleading, false and/or deceptive, and made by Schlegel and CFC in furtherance of a fraudulent scheme.

76. As of February 2014, CFC had not received any net revenue from the oil and gas operations that it held working interests in. Accordingly, it was impossible for CFC to have "almost finished preparing checks" to Phase 1 investors.

### D. Calvo and M&G's Material Misrepresentation

77. In connection with the offerings discussed above, Calvo and M&G misrepresented the percentage of commissions that Calvo's boiler room operation would receive from CFC and Schlegel.

78. Calvo repeatedly told a potential investor that he would receive no more than a 10% sales commission from CFC and Schlegel. The investor later invested $400,000 of his and his family's money with CFC.

79. This representation was false. In the aggregate, CFC and Schlegel paid M&G and Calvo a total of about $1.725 million, or 23% of the funds raised from investors, with initial commissions of up to 38% in March of 2013, an average of 26% for the rest of 2013, and 20% for most of 2014.

80. Calvo and M&G's misrepresentation was material because a reasonable investor in the offering would have considered it important in making their investment to know that a substantial portion of their investment would be lost upfront to a sales agent in the form of a commission. Larger sales commissions mean that less of the investor's money will be used for investment, and they therefore diminish the opportunity for greater returns on investment.

81. Calvo knew these material representations were false when made, or was reckless or negligent in not knowing of their falsity.

### E. Lack of Registration

82. Defendants have directly and indirectly offered and sold CFC's oil and gas investment opportunities through interstate commerce to investors residing in multiple states, including California.

83. Each of the Defendants was a necessary participant and substantial factor in the offer or sale of CFC's purported oil and gas working interests.

84. Defendants have not registered with the SEC any offering of any kind by CFC.

85. No registration statement has ever been filed with the SEC for the offer

or sale of CFC's purported oil and gas working interests.

86. Neither Calvo nor M&G is registered with the SEC as a broker or dealer. Nor is Calvo associated with a registered broker or dealer.

**F.  Calvo's and M&G's Broker-Dealer Activities**

87. Calvo and M&G solicited CFC investors, provided those investors with CFC's offering materials, and participated in taking investors' orders, and therefore induced the purchase or sale of securities.

88. Calvo and M&G received transaction-based compensation in the form of commissions on sales of CFC securities.

## FIRST CLAIM FOR RELIEF

### Fraud in Connection With the Sale of Securities

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) Thereunder

### (against all Defendants)

89. The SEC realleges and incorporates by reference paragraphs 1 through 88 above.

90. Defendants, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter, made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

91. By engaging in the conduct described above, Defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. §240.10b-5(b).

## SECOND CLAIM FOR RELIEF

### Fraud in the Offer and Sale of Securities

### Violations of Section 17(a)(2) of the Securities Act

### (against all Defendants)

92. The SEC realleges and incorporates by reference paragraphs 1 through 88 above.

93. Defendants, by engaging in the conduct described above, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, with scienter, obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

94. By engaging in the conduct described above, Defendants violated, and unless restrained and enjoined will continue to violate, Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2).

## THIRD CLAIM FOR RELIEF

### Fraud in Connection With the Sale of Securities

### Violations of Section 10(b) of the Exchange Act and

### Rules 10b-5(a) and (c) Thereunder

### (against Defendants Schlegel and CFC)

95. The SEC realleges and incorporates by reference paragraphs 1 through 88 above.

96. Defendants Schlegel and CFC, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter:

    a.    employed devices, schemes, or artifices to defraud; or

      b.    engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

97. By engaging in the conduct described above, Defendants Schlegel and CFC violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a) and (c) thereunder, 17 C.F.R. §§ 240.10b-5(a) & 240.10b-5(c).

## FOURTH CLAIM FOR RELIEF

**Fraud in the Offer and Sale of Securities**

**Violations of Sections 17(a)(1) and (3) of the Securities Act**

**(against Defendants Schlegel and CFC)**

98. The SEC realleges and incorporates by reference paragraphs 1 through 88 above.

99. Defendants Schlegel and CFC, by engaging in the conduct described above, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, with scienter:

      a.    employed devices, schemes, or artifices to defraud; or

      b.    engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

100. By engaging in the conduct described above, Defendants Schlegel and CFC violated, and unless restrained and enjoined will continue to violate, Sections 17(a)(1) and (3) of the Securities Act, 15 U.S.C. § 77q(a)(1) and (3).

## FIFTH CLAIM FOR RELIEF

**Sale of Unregistered Securities**

**Violations of Sections 5(a) and 5(c) of the Securities Act**

**(against all Defendants)**

101. The SEC realleges and incorporates by reference paragraphs 1 through 88 above.

102. Defendants, by engaging in the conduct described above, directly or indirectly, made use of means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such securities to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale.

103. No registration statement has been filed with the SEC or has been in effect with respect to any of the offerings alleged herein, and no exemption from registration applies.

104. By engaging in the conduct described above, Defendants have violated, and unless restrained and enjoined will continue to violate, Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c).

## SIXTH CLAIM FOR RELIEF

**Failure to Register as a Broker or Dealer**

**Violations of Section 15(a) of the Exchange Act**

**(against Defendants Calvo and M&G)**

105. The SEC realleges and incorporates by reference paragraphs 1 through 88 above.

106. Defendants Calvo and M&G, by engaging in the conduct described above, made use of the mails or means or instrumentalities of interstate commerce to effect transactions in, or to induce or attempt to induce, the purchase or sale of securities, without being registered as brokers or dealers in accordance with Section 15(b) of the Exchange Act, 15 U.S.C. § 78o(b), and without complying with any of the exemptions promulgated under Section 15(a)(2), 15 U.S.C. § 78o(a)(2).

107. By engaging in the conduct described above, Defendants Calvo and M&G violated, and unless restrained and enjoined will continue to violate, Section 15(a)(1) of the Exchange Act, 15 U.S.C. § 78o(a)(1).

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court:

**I.**

Issue findings of fact and conclusions of law that Defendants committed the alleged violations.

**II.**

Issue judgments, in a form consistent with Fed. R. Civ. P. 65(d), permanently enjoining Defendants, and their agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. §§ 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c), and Section15(a) of the Exchange Act, 15 U.S.C. § 78o(a).

**III.**

Order Defendants to disgorge all ill-gotten gains from their illegal conduct, together with prejudgment interest.

**IV.**

Order Defendants to pay civil penalties under Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

**V.**

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

**VI.**

Grant such other and further relief as this Court may determine to be just and necessary.

Dated: September 30, 2015

                  */s/ Gary Y. Leung*
                  GARY Y. LEUNG
                  MANUEL VAZQUEZ
                  Attorneys for Plaintiff
                  Securities and Exchange Commission